Per Curiam :
This case was referred to Trial Commissioner Saul Richard Gamer with directions to make findings of fact and recommendation for conclusions of law. The commissioner has done so in an opinion and report filed on June 11, 1965. Exceptions and briefs were filed by the parties and the case was submitted to the court on oral argument of counsel. Since the court agrees with the trial commissioner’s findings, opinion and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. Plaintiff is therefore entitled to recover in the sum of $8,324.34 and judgment is entered for plaintiff in this amount.
OPINION OF COMMISSIONER*
Gamer, Commissioner:
A firearms manufacturer complains that, in its performance of a contract to manufacture machine guns for the Army’s Ordnance Department, it suffered damages of over $47,000 due to the issuance by defendant of defective specifications and drawings.
Plaintiff’s contract, entered into on February 18, 1955, called for the manufacture, in accordance with Government specifications and drawings, of over 33,000 submachine guns, with deliveries to commence in January 1956 and to 'be completed by the end of October 1956.
The most important component of the gun was the receiver, which in effect constituted its body. Sideplates extending from and forming a part of the receiver formed *440 two holes into which the rod or prong ends of the stock, another component, were to fit when pushed into the required position.
Defendant’s drawings precisely dimensioned both the receiver and the stock, but, within carefully prescribed limits, permitted certain plus or minus tolerances.
Of the gun’s 51 components, plaintiff subcontracted the manufacture of 32, including the receiver and the stock, both of which were produced by the A. W. Serio Tool Company. However, after completing its dies and producing the first components, Serio discovered that some stocks would not fit into the receiver holes and that others could not, without “binding,” be pushed completely through the holes. The trouble was that, although the components were all dimensioned within permissible tolerances, interferences resulted when the distance between the stock prongs was at one end of their maximum permitted tolerances and the distance between the receiver holes was at the opposite end of their maximum permitted tolerances.
Some stocks did fit properly into some receivers even when pushed through completely. However, the specifications contained a so-called “interchangeability” provision under which all stocks were required to fit all receivers in all positions. It was plain that the dies as then cast would not produce receivers and stocks that would meet the interchangeability requirement, despite the fact that each component in itself was dimensioned as permitted by the drawings.
Immediately upon discovering this situation, plaintiff ordered ‘Serio to suspend production of the two components and, by telephone, advised defendant on June 8, 1955 (confirmed by letter of June 10, 1955), of the difficulty.
It was not until November 9, 1955, some 5 months later, that defendant finally advised plaintiff by telephone (confirmed by letter of November 10, 1955) of the changes that would, by a forthcoming change order, be made on the drawings and which would serve to eliminate the interferences. Without awaiting the formal issuance of the order, plaintiff promptly ordered Serio to make the necessary die changes to conform to the new dimensions. The formal *441 “Engineering Change Order” (dated November 21, 1955) was received by plaintiff on December 15, 1955.
Serio was originally scheduled to ship receivers to plaintiff in production quantities in September 1955, some 4 months prior to plaintiff’s first scheduled deliveries of completed guns to defendant in January 1956. As it was, by the time Serio was able, commencing November 1955, to complete the required die changes, and thereafter to take such other steps as were required for full-scale production, it was not until May 1956 that it could ship receivers to plaintiff in production quantities. These were received by plaintiff on May 18,1956.
Plaintiff, not knowing when defendant would decide on revised dimensions, and finding itself in a position of receiving, pursuant to previously planned schedules, various other components from other subcontractors, found it necessary and advisable to commence whatever production activities it could on or about October 1, 1955. It itself was to manufacture 19 of the components. However, without the receiver, the principal component, production activities were necessarily restricted. Plaintiff itself was also to perform most of the so-called “subassembly” work, as well as the final assembly of the completed gun. Efficient full-scale production, including the assembly work, could not commence until the receipt of the receivers from Serio on May 18, 1956, 7 months and 18 days after October 1, 1955.
Plaintiff had originally planned a production schedule of some 14 months (commencing in September 1955, coincident with the first planned receipt of receivers from Serio, and ending October 31, 1956, the final contract delivery date). Upon plaintiff’s receipt of the receivers from Serio in May 1956, it did thereafter, as planned, complete its production (and deliveries to defendant) within 14 months. However, its actual overall production time was 21 months and 19 days (October 1,1955, when it commenced its production on a limited basis, to July 19, 1957, when final delivery was made). Thus the time by which plaintiff’s performance of the contract was extended (7 months 19 days) coincided almost identically with the time that, after it commenced *442 production, on October 1, 1955, it was delayed by not being able to obtain receivers from Serio (7 months 18 days).
Plaintiff was subsequently allowed and paid, as an equitable adjustment under the contract “Changes” article, the sum of $2,500 (plus $373.75 as “general and administrative” and “profit” allowances) representing Serio’s labor and materials costs in making the die changes. However, after the disallowance of the balance of its claim by the contracting officer, the Armed Services Board of Contract Appeals, upon an appeal hearing of this and certain other claims on the contract made by plaintiff, concluded that this particular claim was in the nature of one for delay damages for breach of contract over which it did not have jurisdiction to grant relief and, without making any findings as to whether there was a breach, or the extent of the delay, or the amount of damages, dismissed the claim.
Manifestly, plaintiff’s delayed performance of its contract resulted from defendant’s defective specifications and drawings. Some receivers and stocks, although manufactured strictly in accordance with the drawings’ dimensions, would not, as required, fit others, which were also in compliance with the drawings’ dimensions. And although some would fit some, all would not fit all, as required by the specifications. Because new dimensions had to be worked out by defendant, resulting in die changes and production delays, plaintiff’s production activities were extended some 7% months. The record indicates no cause for such delay other than the defective drawings, and no other cause is even suggested.
It has long been recognized that the Government must assume responsibility for its own specifications and plans or drawings, the adequacy of which for the intended purpose it is deemed to warrant, and if a contractor is, due to defects therein, hindered or delayed in his contract performance, the Government is liable for such damages as the contractor can demonstrate resulted from the breach. United States v. Spearin, 248 U.S. 132 (1918) ; Steel Products Engineering Co. v. United States, 71 Ct. Cl. 457, 471 (1931) ; Warren Bros. Roads Co. v. United States, 123 Ct. Cl. 48, 81-82, 105 F. Supp. 826, 829-831 (1952) ; Railroad Waterproofing Corp. v. United States, 133 Ct. Cl. 911, 137 F. Supp. 713 *443 (1956) ; Helene Curtis Industries, Inc. v. United States, 160 Ct. Cl. 437, 312 F. 2d 774 (1963) ; Laburnum Construction Corp. v. United States, 163 Ct. Cl. 339, 325 F. 2d 451 (1963).
Defendant, however, asserts that the drawings were in fact adequate, since a properly functioning gun could, at least so far as theoretical dimensions are concerned, be 'built therefrom. The contention appears to be grounded upon the fact that it would be possible, by precisely manufacturing the two components to coordinately designed measurements falling within certain limited areas of the permitted tolerances, to eliminate all interference between all the parts.
This contention cannot be accepted. Unless some reason therefor is indicated, contractors normally are not required, prior to bidding, to undertake an expensive and time-consuming “tolerance check” with respect to every possible permitted dimension of every component simply to verify the accuracy of the Government’s drawings and their suitability for the production of a properly functioning end item. Contractors are ordinarily entitled to assume that parts manufactured in compliance with the prescribed dimensions and permitted tolerances, even the extremes thereof, will, when joined, properly function. Otherwise, the very purpose of the permitted tolerance, i.e., the making of allowances for the slight dimensional changes necessarily resulting from different reactions of different grades and types of steel to heat-treating, welding, or other manufacturing processes, would be destroyed. See Harvey-Whipple, Inc. v. United States, 169 Ct. Cl. 689, 342 F. 2d 48 (1965). This fair assumption would especially be justified where, as here, the gun was not a new or experimental item but had been previously manufactured, and the drawings themselves indicated their existence ever since 1945.
Nor can defendant’s reliance upon such previous manufacture of the gun as proof in itself of the adequacy of the drawings herein involved be accepted. Defendant does not show that all previous manufacture was from the identical drawings that were here issued to plaintiff. Nor, even so assuming, does the record show what difficulties may have been encountered in such manufacture. For all one knows, the defects in these particular drawings, were they the ones *444 that were in fact used in such previous manufacture, may-have actually been demonstrated, but defendant simply negligently failed to make the necessary changes prior to their reissuance on the instant contract. It suffices that on this particular production, the defects on these specific drawings did manifest themselves and that plaintiff promptly, and justifiably, complained with respect thereto.
Defendant’s further contention, in support of its position that the drawings as issued were not defective, that the dimensional changes effected by the change order were made pursuant to plaintiff’s proposal, that they were actually unnecessary and simply an accommodation by defendant to suit plaintiff’s insistence, and that they did not in fact “solve the interference problem” anyway, is not understood. The record shows that the ultimate change order solution did not result from a proposal made by plaintiff for its own benefit, but was jointly worked out in conferences between plaintiff’s and defendant’s officials (although, as a matter of procedure, the solution was, at defendant’s suggestion, and after it was finally jointly agreed upon, cast in the form of a proposal letter from plaintiff to defendant). Furthermore, in direct refutation of defendant’s contention that the change order did “not solve the interference problem,” the order itself set forth the reason for its issuance as:
To eliminate possibility of interference between Stock * * * and Receiver * * * when extreme tolerance conditions are obtained during manufacture.
And the record fails to reflect any further interference problems after the receivers and stocks were manufactured in accordance with the changed dimensions.
Defendant further says that, when plaintiff first reported the interference, defendant’s response was that the situation could be handled by plaintiff’s making “minor adjustments * * * relative to the selection of stock * * * in order to maintain proper functioning.” This, argues defendant, shows that, by making such minor adjustments in the individual instances of nonfitting stocks (presumably by hand grinding), every stock could be made to fit into at least one receiver and that, in suggesting such selective fitting, defendant was in effect waiving the interchangeability require *445 ment. Plaintiff should, defendant argues, promptly have proceeded on that basis, thus obviating any material or substantial delay.
This contention too lacks merit. In making the “minor adjustment” suggestion which defendant now relies on, defendant did not mention the interchangeability requirement. It seemingly failed even to take cognizance thereof. Certainly, no waiver of this important specification could fairly be implied from such silence and from the “minor adjustment” suggestion. Even disregarding the inappropriateness of the selective fitting technique to a large-scale production program, or the increased costs that would necessarily flow therefrom, to which defendant seemed to be oblivious, it was plaintiff who promptly pointed out that the proposed remedy was no remedy at all because a stock made, by special processing, to fit one receiver, might still not fit all the others, so that the interchangeability provision would be violated. And indeed, when plaintiff so demonstrated, defendant, instead of explicitly waiving the interchangeability requirement, already allegedly impliedly waived, abandoned its “minor adjustment” suggestion and subsequently issued the change order which did in fact change the basic part dimensions, thus not only making it possible for large-scale manufacture to proceed in an efficient manner but also preserving fully the interchangeability provision. Clearly, the interchangeability requirement was not, as defendant asserts, “unwanted” and waived. Defendant cannot now rely on a proposed procedure which it itself abandoned after its impropriety was demonstrated.
Defendant’s breach being established, the final problem is the amount of plaintiff’s damages.
There can be little doubt that plaintiff’s production activities were seriously hampered from October 1, 1955, when it commenced whatever production operations it could without the receivers, to May 18, 1956, when the first shipment of receivers in production quantities was finally received, a period of 7 months 18 days. Upon such receipt, plaintiff was able at last to embark on full-scale production and did complete the contract approximately 14 months thereafter, in conformity with an original full-scale production schedule. *446 There is no showing that plaintiff, considering its then position, was not justified in doing what it could do commencing October 1, 1955.[1] It did not know when defendant would finally decide how to solve the problem which it had had under consideration since June. Meanwhile, raw materials and other components, as previously scheduled, were flowing into the plant. And plaintiff itself had 19 of the components to manufacture. Nor is there any showing that, considering what had to be done, including necessary die changes, the delivery of the receivers by Serio on May 18, 1956, was not made expeditiously. As a result, plaintiff’s production operation was extended approximately 7y2 months longer than would have been otherwise necessary. Plaintiff is entitled to recover such excess costs as it can show resulted therefrom.
Defendant, relying on F. H. McGraw & Co. v. United States, 131 Ct. Cl. 501, 130 F. Supp. 394 (1955), argues that the delay period should be reduced by 30 days, representing a reasonable period for defendant to make up its mind as to what to do about the matter. However, the situations are not analogous. What was involved in MoGraw was a stop order issued incident to the making of contemplated changes. MoGraw followed a long series of cases, cited therein, holding that, in the exercise of its reserved right to make changes, the Government is permitted, without incurring damages, to hold up the project a reasonable period of time to consider the changes it desires to make. Under the particular circumstances therein involved, one month was considered reasonable and damages were allowed for only the period in excess thereof. The situation is obviously different where, as here, the entire delay stems from a breach by defendant. In none of the above-cited cases allowing breach damages growing-out of defective plans or specifications was the recovery limited in the manner defendant here suggests.
Even recognizing with considerable latitude the basic rule that, since damages flowing from a delay breach are often impossible to prove with mathematical exactness, “It is sufficient if plaintiff furnishes a reasonable basis for its com *447 putation, even though the result is only approximate” (F. H. McGraw & Co., supra, p. 510), it must nevertheless be concluded that plaintiff has failed to sustain its burden of proving, with the requisite degree of certainty, the major portion of its $47,000 claim. Plaintiff has employed a quite unorthodox method to prove its increased costs. The bulk of its claim (almost $41,000) is for a type of overhead it terms “Indirect Labor.” No claim is made for additional direct labor or materials as a result of the extended production period. Plaintiff concedes that the overall total direct labor and materials going into the finished gun would be the same whether it was applied or incorporated during various stages over a 14-month or a 22-month period. No direct labor was idled as a result of the stretch-out in the production period. At the time herein involved, plaintiff had other Government work and also engaged in commercial production. The direct labor that was dependent upon the receipt of receivers was applied after such receipt in May 1956 instead of before. Once plaintiff did receive the receivers, it went ahead with full-scale production as originally planned.
As to various categories of its “indirect labor,” however, plaintiff claims the situation was different. Plaintiff says the selected categories, constituting employees generally servicing all contracts in its plant, had to spend at least part of their time servicing the instant contract for approximately 21% months instead of 14 and that an appropriate allocation of their total expenses to the contract during the extra period represents excess costs.
In proving this excess, plaintiff selected a “typical” 8-month contract period on the theory that, insofar as these particular “overhead” employees are concerned, their costs to plaintiff for any 8-month period during production would be substantially the same as for any other 8-month period. In presenting its claim to the contracting officer (in January 1957), plaintiff selected as such “typical” period the January 1-August 81, 1956 period because most of it had then recently been audited as an incident of its regular 6-month audit procedures. Plaintiff then calculated the total costs incurred by the selected departments or categories of “indirect labor” on all contracts in its plant during such typical period *448 and then allocated such portion thereof as it concluded, based on its analysis and best judgment, was appropriately applicable to the instant contract.
Considering the nature of most of the categories of “indirect labor” which plaintiff claims, it is not possible to accept plaintiff’s contention that the expenditures therefor during any 8-month “typical” period may appropriately be accepted as similarly applicable to the delay period. Such categories appear necessarily to be closely related to the direct labor operations. Therefore, the same considerations which led to the exclusion of any claim for direct labor would seem to be equally applicable to these categories. For instance, more work would clearly seem to be required of the “Tool Maintenance” department during the period of full-scale production than during the preceding delay period, as would also be true of such production operations as degreasing and polishing (performed by the “Washing and Tumbling” department) , the rust prevention operations (performed by the “Blueing and Parkerizing” department), and the shipping department, since no guns could be shipped to defendant at least until full-scale production commenced. The “typical” period selected by plaintiff includes several months of full-scale production. It is not proper to relate the expenses incurred therein to the prior delay period. While the proper measure of damages is the actual excess costs shown to have been incurred arising out of defendant’s breach and due to it (Commerce International Co. v. United States, 167 Ct. Cl. 529, 338 F. 2d 81 (1964)) in a case such as this it seems clear that such “indirect labor” excess costs would be those incurred during the delay period itself, i.e., October 1,1955 to May 18, 1956.[2] Laburnum Construction Corf. v. United States, supra, at 352. The excess labor costs incurred during this period must be satisfactorily proved. They cannot be presumed from the mere fact of delay, Commerce International Co. v. United States, supra, at 542-3, and to be in the identical amounts as were expended during nondelay periods.
Furthermore, the proof shows that plaintiff efficiently utilized many of its indirect labor employees in the various departments on an “as needed” basis. Plaintiff customarily *449 transferred employees between departments to handle functions as the need arose from day to day. As with the direct labor, there is no showing that any “indirect labor” employee stood idle as a result of the delay. In 1956 plaintiff doubled its commercial work over 1955. And it had other Government work during the period involved.
The record does show, however, that plaintiff incurred certain costs and expenses, such as travel expenses and the time of its engineers, which were directly attributable to the dimensional errors. These are clearly recoverable. In addition, plaintiff has sufficiently carried its burden of proving that excess costs relating to three of the claimed “indirect labor” categories were incurred during the delay period, including a foreman who was hired specifically for this contract and whose salary therefore extended over 21 months instead of 14 months as planned. The excess labor costs thus proved, to which are added, at appropriate rates, certain overhead items applicable thereto, total $8,324.34. The details and bases for the computation of this amount are set forth in findings 46-50. No claim for profit is made, and none is allowed.
Accordingly, judgment should be entered for plaintiff in said sum of $8,324.34.
Findings on Fact
1. Plaintiff is a New York corporation having its principal place of business in Ithaca, New York. It has been engaged in manufacturing and selling firearms since 1880 for both civilian and military use.
2. On December 3, 1954, defendant, acting through the Army’s Ordnance Department, Springfield Armory, Springfield, Massachusetts, issued an invitation for competitive bids for the manufacture and delivery of 33,227 M-3A1 subma-chine guns, caliber .45, at a fixed price, in accordance with drawings and specifications prepared and furnished by defendant.
3. Plaintiff, as a prospective bidder, was given specifications and complete part drawings for all components of the submachine gun, consisting of over 140 separate drawings. The drawings set forth the precise dimensions and permissi *450 ble tolerances for each component. Included were drawings pertaining to the receiver and stock of the gun.
4. The gun was composed of 51 components and 15 subas-semblies. Plaintiff planned to have approximately 32 of the components manufactured by 10-15 subcontractors. Plaintiff itself planned to manufacture 19 components, perform most of the subassembly operations, and complete the final assembly. In the preparation of its bid, plaintiff distributed to the various subcontractors the drawings pertaining to the components which they were to make. Their cost estimates were then included in the computation of plaintiff’s bid.
5. Included among the proposed subcontractors, as the prospective manufacturer of the stock and the receiver, as well as certain other components, was the A. W. Serio Tool Company of Elmira, New York (hereinafter referred to as “Serio”). Serio was formed in 1947, to manufacture tools, dies, and metal stampings. The company was one of the largest tool and diemakers in upstate New York and had previous experience with Government contract work. Plaintiff furnished Serio with the part drawings of the components upon which it was to bid, including the stock and the receiver, and Serio prepared its bid estimates on such components.
6. Plaintiff submitted a bid, and on J anuary 17,1955, was notified that it was awarded the contract for a total price of $662,546.38, or $19.94 per gun.
7. In J anuary 1955, upon receiving notice that it was the successful bidder, plaintiff instructed Serio to commence work on the receiver and stock components. Serio, which had worked closely with plaintiff on the bid and was familiar with the part drawings, started work immediately.
8. On February 18, 1955, a formal contract for the manufacture and delivery of the gun, designated Contract No. DA-19-058-OED-7894, was executed by plaintiff and defendant.
9. The contract did not set forth a production schedule for plaintiff to follow.[1] After notification of the award on Jan *451 uary 17, 1955, plaintiff developed its own production plans and schedule. Its plans involved the assignment of existing equipment and personnel, the acquisition of new equipment, and the employment and training of new personnel, as needed. It also involved the allocation of floor space on a separate floor in plaintiff’s plant for setting up equipment,[2] the ordering of raw materials from numerous suppliers and the ordering and scheduling of component parts from subcontractors.
10. The contract contained a delivery schedule under which plaintiff was to deliver finished submachine guns to defendant over a 10-month period as follows:

Number of guns scheduled 1SSS for delivery

January_ 200
February- 500
March _1,000
April-1,500
May -2,500
June_3, 500
July -5,000
August_7,000
September_9,000
October _3,027
11. Plaintiff reasonably concluded that if it geared production to a fluctuating delivery schedule, it would make stable employment and efficient plant operations difficult. Accordingly, with the knowledge and acquiescence of defendant, plaintiff scheduled its production to commence in September 1955, coincidental with the scheduled first delivery of receivers from Serio, and to gradually work up, after the first few months, to a relatively level monthly rate of approximately 3,500 guns, ending with the final delivery of the sub-machine guns to defendant in October 1956. Thus, the planned production period was 14 months, i.e., from September 1955 through October 1956. The schedule contemplated the building of an inventory of finished submachine guns starting in the latter part of October 1955, prior to the *452 first delivery of finished guns in January 1956, and continuing through the early months of the delivery schedule. With such an inventory plaintiff would thus be able to meet its contract obligation to deliver increasing monthly quantities of finished guns in the final months of the delivery schedule.
12. On March 31, 1955, plaintiff issued a written purchase order to Serio for the “receiver without cover assembly” at a unit price of $1.46. The order formally confirmed plaintiff’s understandings with Serio, and furnished Serio with a schedule for delivery of receivers to plaintiff’s plant. Pursuant to the schedule Serio’s first delivery of receivers was set for the first week of September 1955 and the last in the first week of September 1956, thus covering a 13-month period. The delivery schedule called for the delivery of a total of 36,000 receivers, 2,773 more than required for manufacture of the 33,227 finished weapons ordered by the Government. However, the order left the exact quantity open, providing that it was not to exceed 34,500 and that “we will advise definite quantity after we receive 10,000 parts.” The delivery requirement for each month was to be made during the first week of the month, commencing with 300 for September 1955 and gradually working up to 3,600 for January 1956, which rate was maintained at that level thereafter, as follows:

1955

September_ 300
October _ 600
November_ 900
December - 1,800

1956

January_3,600
February_3,600
March _3, 600
April_3, 600
May _3,600
June_3, 600
July _3, 600
August_3,600
September_3, 600
13. The receiver constituted the main component of the submachine gun. The barrel, the trigger assembly, the bolt, and other components and subassemblies were attached to it at various stages of production. The receiver was comprised *453 of right- and left-hand sideplates each cut and formed to precise dimensions and welded together. Attached to it were a front and rear sight, a cover plate hinge, front and rear belt loops, a barrel bushing and convex right and left stock retaining plates. The receiver thus assembled was technically called the “receiver without cover assembly.” The convex stock retaining plates, when welded to the receiver opposite corresponding concave grooves in the receiver sideplates, formed an opening or hole on each side of the receiver into which the stock was to be inserted. It was essentially in this condition that receivers were to be shipped by Serio to plaintiff for further manufacturing.
14. The stock was made of one piece of precisely dimensioned steel rod cut to length and then bent to shape. As formed it had two substantially parallel prongs at one end which were to be inserted into the holes formed by the side-plates and the stock retaining plates on the receiver. The other end was bent downward to form a handle. The gun was so designed that the stock could be pushed forward against the rear of the receiver or extended to a locked position. When so extended and locked it could be used as a shoulder rest. The stock was also designed to be completely removable from the receiver and easily reassembled.
15. The contract incorporated by reference Military Specification MIL-G-1175, dated July 22, 1949, entitled “Gun, Submachine, Caliber .45, M3”, as amended by the contract. With respect to interchangeability the amended specifications provided as follows:
F-6 Interchangeability test. — Ten submachine guns selected by the inspector from each lot shall be tested for interchangeability of like components and assemblies which are likely to require replacement. Test frequency may be reduced by the contracting officer when a record of consistently satisfactory results has been established.
F-6a Components and assemblies readily disassembled as shown in the list to be furnished by the procuring agency shall be disassembled from the weapons. Components of each kind shall be placed together and mixed. The submachine guns shall be reassembled without fitting or altering any component in any way except that hand fitting will be allowed on not more than two sub-machine guns, provided that, as a result, no component *454 or assembly is rendered unsuitable for assembly in other submachine guns. The 10 assembled submachine guns shall operate and function properly.
Under these provisions all stock components were to be interchangeable with all the “receivers without cover plate”, both of which Serio was manufacturing (the “receiver without cover plate” constituting an “assembly”).
16. The manufacture of the submachine gun involved a total of 206 individual operations. Approximately 65 operations, including subassemblies and final assembly, were performed on the receiver without cover assembly after it was received by plaintiff from Serio. Plaintiff’s planned production schedule allowed approximately 7 weeks for the completion of these 65 operations.[3]
17. The manufacture of the components by Serio involved the preparation of tool drawings for, and the making of, the necessary dies. In the manufacture of the receiver side-plates, nine different dies were required, each die consisting of two major parts. The blank die cut the steel to the proper size, draw dies formed the sideplates, trim and restrike dies finished the plates, and pierce dies punched holes in the plates. Four dies were required for the manufacture of the stock and three for the stock retaining plates.
To hold the receiver sideplates to the specified dimensions and tolerances under the heat of welding, three steel cylinders called mandrils, ground and formed to precise dimensions, and inserted into the receiver during the welding process, were also required.
18. All dies necessary for the manufacture of the receiver without cover assembly and the stock were made by Serio in its plant. Approximately 15 diemakers were assigned to the making of the dies for the receiver sideplates, the stock, and the retaining plates. All of this work proceeded diligently and in accordance with accepted practices.
19. In manufacturing the dies, Serio used drawings for the pertinent components supplied to plaintiff by defendant. The stock drawing specified that the distance between the *455 two rods, as measured from the centerline of each rod at a point near the handle end (as distinguished from the measurement at the extreme end of the prongs, designated as 1.196 inches with tolerances permitted of plus .060 or minus .0250 inch), was to be 1.208 inches with a plus or minus .010-inch tolerance. The receiver assembly drawings specified the distance between the holes into which the stock was to be inserted, as measured from the centerlines of each opening on the right and left side of the receiver, to be also 1.208 inches, but with a plus or minus .020-inch tolerance. Therefore, the distance between the centerline of the rods of the stock at the handle end could vary from 1.198 to 1.218 inches, while the distance between the centerline of the holes could vary from 1.188 to 1.228 inches. The size of the holes was specified on the drawings by a radius from the center of each hole of .140 inch with a plus .005-inch tolerance. The effect of this dimension was to describe the arc or curvature of the stock retaining plates and the corresponding indentation or groove in the receiver sideplates so that when the retaining plates were welded to the receiver plates, holes having the specified radius were formed.
20. The tolerances allowed for the receiver and stock were intended to accommodate shrinkage or springback of the steel used in the manufacture of the two components.[4] The type of steel specified in the part drawings for the receiver (WD-1010-1020 sheet steel having a thickness of .062, plus or minus .005, inch) differed from that specified for the stock (FS-1020 cold drawn steel having a diameter of .285, minus .006, inch). Serio used only the steel specified for the various components.
21. Neither the contract, the part drawings, nor the specifications stated the precise dimensions to which the dies for the receiver, the stock and the stock retaining plates were to be made. Customarily, the selection of dimensions for dies is left to the discretion of the diemaker. Since the part drawings for the stock permitted an equal plus or minus variation *456 from the specified dimension near the handle, Serio made the dies for the stock to such specified dimension of 1.208 inches. Similarly, Serio made the dies for the receiver side-plates to the specified dimension of 1.208 inches.
22. Serio completed the dies and produced sample quantities of receivers and stocks by June 6,1955. The production samples were then checked by Serio for conformity with the required dimensions. However, although the components were within permissible tolerances, some stocks would not fit into the holes of some receivers. Also, in some instances, although the unsupported extreme prong ends of the stock could, by hand pressure, be made to insert into the holes, it was not possible to push the stock completely through to the handle end, the dimensions and tolerances at that end differing from those on the extreme prong end. The interferences occurred when the distance between the stock rods was at one end of their maximum permitted tolerences and the distance between the receiver holes was at the opposite end of their maximum permitted tolerances.[5] Although some stocks did fit into some receivers, the interchangeability requirement made it necessary for all stocks to fit all receivers in all positions.
23. Serio promptly, on or about June 6,1955, notified plaintiff that certain stocks would not fit with certain receivers. *457 Plaintiff thereupon instructed Serio to cease production of both, the receiver and the stock.
24. The interference between the receiver and stock could be eliminated by several alternative methods, all of which required a change in the specifications or the dimensions shown on the pertinent part drawings. Plaintiff did not know what method the Government would wish to adopt to correct the interference problem. On June 8,1955, plaintiff, by telephone, notified the Rochester Ordnance District, which was charged with the responsibility of supervising and administering the contract, of the interference, and confirmed such notice by letter dated June 10,1955, reading in part as follows:
As per our telephone conversation of the other day we have run into several interferences on the M8A1 — 45 cal. submachine gun.
We have the dies all made and there is going to be quite some expense in changing them over.
The requested changes are as follows:
1. On the Receiver w/o Cover Assembly (D-7161931) the left hand view shows a dimension of 1.208±.020. The Stock (C-7161932) which fits across this dimension in the completed arm has a dimension of 1.208±.010. A Stock at 1.198 will not fit into a Receiver w/o Cover Assembly which has a dimension of 1.228. The tolerance on the Stock and the Receiver w/o Cover Assembly should be cut down so that the extreme will give a reasonable fit.
25. Having received no response to its letter of June 10, 1955, plaintiff wrote a second letter on June 16, 1955, urging prompt resolution of the interference problem and advising that if authorized changes were not received by June 23,1955, there was “sure” to be a delay in making deliveries of finished guns. The letter again pointed out that the dies would have to be reworked.
26. Rochester Ordnance District replied to plaintiff’s notification and letters by a letter dated July 1, 1955, which was received by plaintiff on July 6, 1955. The letter enclosed and referred to a memorandum dated June 28, 1955, from the Springfield Armory, reading in part as follows:
1. The Armory has completed a study of changes requested in drawings pertaining to Gun, Submachine, *458 Cal .45, M3A1 by Ithaca Gun Company, copies of letters inclosed with basic letter.
2. The following action will be taken on the changes referred to above:
a. Changes requested in inclosure one of basic letter, under paragraphs 1, 2, and 3 are not concurred in and will not be made for the following reason:
(1) On Receiver, Without Cover, Assembly, drawing D7161931, dimension 1.208±.020 is an assembly requirement and must be maintained by the use of welding fixtures. The tolerance range covers possible accumulation of component allowances as far as the theoretical center line of the openings are concerned. However, the size and location of the openings must be controlled so that the stock will function, assemble, and disassemble as required by the item specification (MIL-G-1175, paragraph É-11). Minor adjustments may be necessary relative to the selection of stock, C7161932, in order to maintain proper functioning.
27. Plaintiff reasonably concluded that the solution proposed by the Springfield Armory was not proper because it disregarded the contract requirement that all the stocks and receivers be interchangeable. Selective fittings produced by making “minor adjustments” (i.e., by hand-grinding) would fail to solve the problem, on a mass production basis, of complete interchangeability, which was a contract requirement and an inspection criterion. On July 13, 1955, plaintiff’s factory manager and three engineers went to Springfield Armory to discuss the solution to the interference problem. As a result of the meeting, defendant agreed to study the matter further and to reach a decision during the first week of August 1955.
Thereafter, Springfield Armory sent Warren Odell, an engineer, to plaintiff’s factory to discuss the problem with plaintiff’s engineers. Changes to the part drawings were discussed and a solution finally agreed upon.
28. On August 18,1955, plaintiff, at Odell’s suggestion, and to confirm its meeting with Odell and the changes to the pertinent drawings which had been developed, wrote to the Rochester Ordnance District, as follows:
Following our letter to you of July 20,1955 regarding the dimension discrepancy in the print D-7161931 Re *459 ceiver w/o Cover Assembly, Mr. Warren Odell from Springfield Armory visited onr plant. As a result of that conference and at his suggestion we are submitting dimension changes which we believe will correct the situation as follows:
Dwg. C-7161929 Plate, Side R.H.
Change .397 + .005 to .394 + .005
Change .140 R + .005 to .143 R + .005
Delete dimension .500 ± .005
Add dimension .106 ± .005 which will establish the distance between the present .397 + .005 surface and the .500 ± .005 surface.
Copies of the sectional layout as proposed are enclosed.
Our position at present is that our subcontractor has made the Receiver w/o Cover D-7161931 to a print dimension of 1.208 ± .020. His parts actually measure approximately 1.226. He had made the Stock C-7161932 to a print dimension of 1.208 ± .010 and actually measures approximately 1.200. The Stock C-7161932 will not assemble properly to the Receiver w/o Cover Assembly D-7161931 due to the approximate .028 [6] interference, yet the two parts are made to print.
If the Stock C-7161932 is altered to fit the Receiver w/o Cover Assembly D-7161931, the Stock Assembly C-7161932 will be beyond its print which we have no right to do. Secondly, we have no right to require our subcontractor to alter the Receiver w/o Cover Assembly D-7161931 to fit the Stock Assembly C-7161932 as the receiver w/o Cover Assembly D-7161931 is already to print.
Another consideration is interchangeability with parts in the field. _ The Stocks C-7161932 in the field will not fit our Receiver W/o Cover Assembly D-7161931 if the sample gun we have is any indication of the guns previously made. Our sample gun measures about 1.196 and the Stock measures about 1.198.
It is suggested that our Receiver W/o Cover Assembly be made similar to the sample gun we possess, then there will be the possibility of interchangeability with guns in the field.
It has been noted that the sample gun measures .113— .124 corresponding to our requested .106+ .005 dimension. By using the old figures of .397+.005 and .500 *460 ± .005 a size range of .108 to .093 is allowed. The previous manufacturer obviously did not make the side plate to the present print dimension. Our requested changes approach the dimensions on our sample gun but do not meet them due to the fact that the dimensions on the sample give a possibility of interference with the assembly of the oiler assembly to the Eeceiver w/o Cover Assembly.
Since production on the Eeceiver and Stock have been stopped pending a decision on this matter we would appreciate an early reply. Our meeting the scheduled deliveries is dependent on a prompt answer.
29. One of the proposed changes to effect a solution to the interference problem involved an increase in the radius of the holes on the receiver. As shown (finding 19), the part drawings originally specified a radius of .140 with a permitted tolerance of plus .005 inch, and the proposed change (finding 28) increased the radius to .143 plus .005. The effect of this change was to enlarge the holes into which the rods of the stock were to be inserted. Although other changes were also proposed (finding 28), the centerline distances and tolerances for the receiver holes and the stock were not changed. All the changes in their total effect eliminated the interference problem without loss of complete interchangeability of receivers and stocks as required by the contract.
30. Since the interference could be rectified in various ways (such as, for instance, changing the stock or receiver dimensions) and since Serio did not know which method defendant would prefer, it did not recommend any particular method. Similarly, it could not estimate the costs involved because it did not know which solution for the problem defendant would select.
31. On September 12,1955, defendant wrote to plaintiff advising that the proposed changes as set forth in plaintiff’s letter of August 18, 1955, were being processed and that plaintiff would be informed of defendant’s decision when such processing would be completed.
32. During the period when plaintiff and defendant were corresponding and conferring about the possible changes in the specifications and dimensions, certain aspects of plaintiff’s *461 planned production program commenced and continued. Plaintiff had no way of knowing when defendant would make a decision, and justifiably felt that it had to get started. Space in plaintiff’s plant was allocated to the contract operations, and equipment installed. Raw materials and supplies relating to plaintiff’s own component manufacturing operations, as well as certain subcontracted components other than the Serio stocks and receivers, were being received pursuant to prearranged delivery schedules. On or about October 1,1955, plaintiff began certain manufacturing operations on components other than the receiver and stock.
33. On November 9, 1955, 5 months after plaintiff first notified defendant of the interference problem (i.e., on June 8, 1955 (finding 24)), the Rochester Ordnance District advised plaintiff by telephone that the changes referred to in plaintiff’s letter of August 18,1955 (finding 28) had been approved. By letter dated November 10, 1955, the District confirmed the telephone conversation and advised that an engineering change order would be issued in a few days. On November 11, 1955, upon receiving the District’s letter, plaintiff sent a letter to Serio instructing it to proceed with the changes in the dies necessary to implement the changes. On December 15, 1955, plaintiff received formal notification of the changes through Engineering Change Order No. 23146 dated November 21,1955. The engineering change order did serve to eliminate the interference problem without impairing the interchangeability of receivers and stocks. The order itself set forth the “Reason for Change” as:
To eliminate possibility of interference between Stock, C-7161932, and Receiver, w/o Cover, Assembly, D-7161931, when extreme tolerance conditions are obtained during manufacture.
The changes set forth m the order were identical to those contained in plaintiff’s letter of August 18,1955.
34. After being notified by plaintiff’s letter of November 11, 1955, of defendant’s intention to issue a change order authorizing the changes set forth in plaintiff’s letter of August 18, 1955, Serio started immediately to remake and rework the dies affected by the changes. Portions of the draw and *462 restrike dies bad to be remade and reworked. In addition, two of the three mandrils had to be remade with increased diameters. Making the necessary changes on each die was precision work of a time-consuming character since it could be performed efficiently only by one diemaker. Serio assigned one diemaker to work on the draw dies and another to work on the restrike dies. All work was performed continuously until completed. Approximately 8 weeks were required to remake and rework the dies.
35. Approximately 2 to 3 weeks after completing the die changes, Serio completed the production of 25 to 30 samples of the receiver for testing and inspection. These were submitted to plaintiff for processing into finished guns and testing and inspection. Approximately 4 weeks after receiving the samples, plaintiff notified Serio of their approval.
36. Thereafter, an additional 3 weeks were required by Serio to make the necessary preparations for the commencement and maintenance of large-scale production in an efficient and continuous manner.
37. (a) During this period, and prior to the receipt by plaintiff from Serio of any receivers with the modified design defendant, by letter of January 16, 1956, stating that “It is understood that you have been delayed as a result of modifications in design”, and that “It is necessary that the contract be modified to reflect a realistic [delivery] schedule”, requested plaintiff to “submit a complete new schedule providing for initial deliveries at the earliest possible date and completion of the contract not later than October 1956.” October 1956 was the final delivery date set forth in the contract (finding 10). However, under the contract delivery schedule, deliveries of completed guns were supposed to have commenced in January 1956, which was now impossible.
(b) In response plaintiff, by letter of January 17, 1956 stated “* * * we regret to advise that it is impossible * * * to squeeze an original schedule of ten months into six.” Plaintiff instead suggested a new 10-month delivery schedule (the contract schedule also being 10 months) commencing in May 1956 and ending in February 1957, in monthly amounts the same as set forth in the contract delivery schedule, also *463 stating, however, that “the contractor will make every effort to improve this schedule.”[7]
38. On April 6, 1956, Serio made an initial delivery of 36 receivers to plaintiff (three more being received on April 19, 1956). However, regular delivery of production quantities of receivers to plaintiff could not be made until May 18,1956, and thereafter Serio continued to make shipments through February 1957. The number of receivers Serio shipped every month during such April 1956-February 1957 period was as follows:

1958

April - 39
May - 516
June-1,043
July -1,945
August -3, 044
September_4,007
October-5, 950
November_5, 598
December _5, 004

1951

January -4,643
February-2,268
Thus, commencing May 1956, Serio completed its deliveries over a 10-month period instead of the 13-month period originally planned (finding 12). It was able to do so by increasing the number of receivers shipped during several months over the highest amount previously scheduled, i.e., 3,600 (finding 12). In five of Serio’s 10-month delivery period, it shipped over 4,000 receivers, in one month (October 1956) shipping almost 6,000.
39. During the period from October 1955, when plaintiff first commenced its overall production work, to May 18,1956, when plaintiff first received from Serio receivers in production quantities, plaintiff was performing manufacturing operations on the submachine gun to the extent possible without *464 the receiver. However, such operations were limited since the receiver was the basic component of the gun. Work on the 19 components which plaintiff planned to produce in its plant did proceed and certain subcontracted components were received and processed.
40. Plaintiff made its first delivery of finished guns to defendant on July 31, 1956, when it shipped 1,000 guns. This was approximately 2y2 months after first receiving (on May
18, 1956) receivers from Serio in production quantities. Thereafter, plaintiff continued to make monthly shipments of finished guns to the Government until delivery of the 33,227 guns required by the contract was completed on July
19, 1957. Plaintiff’s complete deliveries, made over a 13-month period (as against the contract delivery schedule of 10 months (finding 10)), were as follows :

1956

July_1,000
August_1, 817
September _1,410
October _2, 900
November_2, 880
December_3, 000

1957

January _3, 920
February _3, 500
March _2, 800
April -2,600
May -3, 200
June-3,200
July_1, 000
41. (a) As shown, plaintiff originally planned to commence its production in September 1955, when it was scheduled to receive the first delivery of receivers in production quantities from Serio (finding 11). It would then take approximately 2 months, or until the end of October 1955, to complete the manufacturing process and to produce finished guns. Plaintiff then had planned to keep producing, and maintaining an inventory of completed guns, throughout November and December 1955, prior to the commencement of required deliveries in January 1956, as well as during the early months of the delivery schedule when comparatively small *465 amounts were required to be delivered (i.e., 200 in January 1956 and 500 in February 1956). This creating of an inventory of completed guns, at a production level of approximately 3,500 guns per month (finding 11), would permit plaintiff to meet the large delivery requirements in the latter part of the original delivery schedule, which went as high as 9,000 guns in September 1956. Plaintiff’s final delivery was scheduled for October 1956, which was also the final scheduled month of plaintiff’s production operations. Thus, plaintiff’s planned production period extended from September 1955 through October 1956, or 14 months, and its delivery period from January 1956 through October 1956, or 10 months.
(b) Plaintiff’s actual production period, after the receipt of receivers from Serio in production quantities (May 18, 1956) was also approximately 14 months (deliveries being completed on July 19,1957 (finding 40)). (Evidently little or no benefit was realized, on an overall basis, from the limited production activities that had been in operation since October 1, 1955.) However, plaintiff commenced deliveries of completed guns to defendant approximately 2 months after receiving production quantities of receivers from Serio (finding 40) rather than 4 months thereafter, as originally planned (finding 11), and in larger initial quantities than originally called for (i.e., 7,127 during the first 4 months (finding 40) instead of 3,200 as originally planned (finding 10)). Thus, plaintiff did not have 4 months within which to build up an inventory of completed guns, as originally planned. Geared to an even production schedule working up to approximately 3,500 per month, it took plaintiff approximately 13 months to complete its deliveries to defendant (finding 40) instead of the 10 originally planned. Plaintiff’s planned production schedule of approximately 3,500 per month was tied into a prospective monthly delivery of receivers from Serio at approximately the same rate (finding 12). It did not contemplate accelerated deliveries on Serio’s part going as high as 6,000 receivers per month (finding 38). There is no showing that plaintiff’s extended delivery period was due to any fault on plaintiff’s part and that, had it commenced deliveries 4 months after the receipt of receivers from *466 Serio, as originally planned, instead of 2 months thereafter (in an effort to get guns into defendant’s hands as soon as possible), it could not similarly have compressed its deliveries over approximately a 10-month period, as originally contemplated. Plaintiff simply commenced making deliveries approximately 2 months sooner than its production schedule originally called for. The record indicates no complaints from defendant concerning the rate of plaintiff’s deliveries or the period thereof. The delivery schedule set forth in the contract was never amended.
42. Compared to plaintiff’s original production schedule of 14 months, i.e., September 1, 1955 to October 31, 1956 (finding 11), the actual production time required for completion of the contract was 21 months and 19 days, i.e., the period from October 1, 1955, when plaintiff commenced its production on a limited basis (finding 32), to July 19, 1957, when final delivery was made (finding 40). The 7 months and 19 days by which plaintiff’s performance of the contract was extended was caused by the dimensional defects in the Government-furnished drawings for the receiver assembly, and the time taken by defendant to correct such defects.
Similarly, the period of October 1, 1955, when plaintiff first commenced production, but on an ineffective and limited basis due to lack of receivers, to May 18, 1956, when it first received receivers from Serio in production quantities, was 7 months and 18 days.
43. Serio charged plaintiff $2,500 for the reworking and remaking of its dies necessitated by the Engineering Change Order of November 21, 1955, which made dimensional changes, and plaintiff paid said amount to Serio.
44. (a) By letter of January 7, 1957, to defendant, which was during plaintiff’s production and delivery period, plaintiff submitted to the contracting officer a claim relating to the engineering change order, as well as other matters. With respect to the change order, the claim was in the amount of $53,225.50. Included therein was the amount of $2,500 paid by plaintiff to Serio.
(b) Except for the sum of $2,500 paid to Serio, the contracting officer, by letter of August 12,1957, denied plaintiff’s claim.
*467 45. (a) Plaintiff, under article 2 of the contract relating to “Changes” [8] and article 12 relating to “Disputes”,[9] appealed the contracting officer’s decision on this claim (and others) to the Armed Services Board of Contract Appeals, contending that the amount disallowed constituted increased costs incurred as an “incident to the changes required by such change order.” Plaintiff claimed the costs resulted from the delay caused by “inconsistent” and erroneous dimensions in the Government drawings.
Defendant moved to dismiss the appeal on the grounds that it was a claim for damages for delay and not a claim for increased costs resulting from the change order and therefore beyond the jurisdiction of the Board.
The Board denied defendant’s motion with leave, however, to renew the motion after a hearing on the merits. After *468 such, a hearing before an Army Appeals Panel of the Board, defendant renewed its motion.
On May 31, 1960, the Panel decided that “from the evidence” it was apparent that, except for the admitted liability of $2,500, plaintiff’s claim was for increased costs occasioned by defendant’s furnishing of drawings with dimensional defects followed by a delay in making the necessary changes, that such costs could not be covered by the “Changes” article, and that “* * * it is well established that in the absence of contract provisions which expressly or impliedly permit the price adjustment sought this Board is without authority or jurisdiction to adjust the contract price.” The Board therefore denied this portion of plaintiff’s appeal (allowing, however, the additional amount of $873.15 as appropriate “general and administrative” and “profit” adjustments with respect to the uncontested $2,500). (ASBCA No. 4576.) No findings were made concerning the extent of the delay caused by defendant, or the increased costs incurred by plaintiff as a result of such delay.
(b) On December 30, 1960, plaintiff filed its petition in this court.
46. (a) In its petition, plaintiff claimed the sum of $49,-667.45 as damages arising out of an 8-month delay in plaintiff’s production schedule, i.e., 14 months as originally planned as against 22 months actually experienced (par. 12), as a result of defendant’s furnishing erroneous drawings and its unreasonable delay in correcting them. However, the claim is now amended and adjusted to conform to the actual period by which plaintiff’s original production schedule was extended as measured by the completion date, i.e., 7 months and 19 days (finding 42), the amended claim now being in the adjusted amount of $47,287.20.
(b) Plaintiff’s revised claim for 7 months and 19 days is as follows:
1. Travel expenses to Springfield, Mass- $215. 47
2. Engineering time to work out interference — 40 brs. at $6_ 240. 00
3. Indirect labor:
Supervision and Foremen_$4,393.23
Engineering_ 411.53
Factory Office_ 1, 840. 86
*469 Maintenance — General_$5, 002.98
Maintenance — Tools_ 1,176. 26
Janitors_ 4,092.18
Safety and Fire Prevention_ 1,032.46
Set-up_ 1,051. 95
Inspection — Tools and Gages_ 2, 687. 69
Washing and Tumbling_ 934.13
Receiving and Shipping_ 1, 097.49
Production Control — General_ 3, 732.35
Production Control — Time Study_ 3, 813. 91
Storeroom_ 2, 945.93
Blueing and Parkerizing_ 3,479.65
Material Handlers_ 3,213. 81
Total Indirect Labor_$40,906.41
4. Disability and Group Hospital on above — 20 employees at $2.38X7 months and 19 days _ 362.37
5. Group Insurance on above — 20 employees— $28,000 at $1.53X7 months and 19 days_ 326.14
6. Pension contributions — 2% X $40,906.41_ 818.13
7. Compensation Insurance $.824/CX$40,-906.41 _ 337.07
8. F.I.C.A. Taxes — 2% X $40,906.41_ 818.13
9. Unemployment taxes — 3%X$40,906.41_ 1,227.19
Total Payroll Taxes and Fringe Costs_ 3, 889.03
Total Direct Costs_ 45, 250. 91
10.General and Administrative Expenses at 4%%_ 2,036.29
Total Amended Claim_ 47,287.20
47. Tra/oel Exf ernes. The first item of the claim is the amount expended by plaintiff in connection with the trip on July 13,1955, from Ithaca, New York, to Springfield, Massachusetts, by plaintiff’s factory manager and three engineers to discuss the solution to the interference problem (finding 27). This expense of $215.47 was directly attributable to the dimensional errors.
48. Engineering Time. The second item of the claim represents the extra time spent (40 hours) on an hourly rate basis ($6 per hour) by plaintiff’s engineers in its engineering department in analyzing the interference problem and evolv *470 ing a proposed solution tberefor. The expense of $240 was directly attributable to the dimensional errors.
49. Indirect Labor, (a) The third item of plaintiff’s claim, divided into 16 sub-items, represents alleged increased costs of $40,906.41 incurred in 16 categories of indirect labor (classified by plaintiff in its records as part of its “Indirect Factory Overhead” account). Plaintiff contends that the employees in these 16 categories or departments had to spend at least a portion of their time on this contract for 7 months 19 days longer due to the delay caused by the dimensional errors.
(b) No additional direct labor or material costs are claimed as a result of the extended production period. The overall total direct labor and materials going into the finished gun would be the same whether it was applied or incorporated during various stages over a 14-month or a 22-month period. No direct labor was idled as a result of the stretch-out in the production period. At the time herein involved, plaintiff had other Government work and also engaged in commercial production. The direct labor that was dependent upon the receipt of receivers from Serio was applied after such receipt in May 1956 instead of before. Once plaintiff received the receivers, it went ahead as originally planned.
(c) However, plaintiff claims the situation was different as to the 16 categories of “indirect labor,” which labor, as a part of plaintiff’s “overhead” costs, was hired as part of its general staff to service all the contracts in its plant. Since some activity of a general “production” nature was proceeding on this contract for approximately 22 months instead of 14 as planned, plaintiff contends that employees from the categories or departments concerned were obliged to spend, on an overall basis, a greater amount of time in servicing this particular contract, i.e., allocations of their time to this contract should be made over a 22-month period instead of a 14-month period. The services involved were, plaintiff contends, continuously necessary.
(d) When plaintiff first prepared its claim for presentation to the contracting officer in January 1957, it was in the midst of its production schedule. It did not then know when the contract would be completed or that the total overall pro *471 duction period would in fact be 22 months, approximately 8 months longer than the planned 14 months. At that stage, it would have had to anticipate or project if it wished to claim on the basis of an overall extended production period. Instead, the 8-month delay period it then calculated was the period between September 1955, when it was first scheduled to receive receivers from Serio and to commence its production, and May 1956, when it actually first received receivers in production quantities.
Having thus established an approximate 8-month delay, plaintiff felt it would be appropriate to take any typical or representative 8-month production period, then ascertain what the total of the indirect labor costs in each of the 16 categories or departments were during such period, and then calculate, on some reasonable apportionment basis, what part thereof should be allocated to the gun contract. Since at that time (January 1957), the latest audited period in plaintiff’s business was the 6-month period January 1-July 1, 1956, that period was selected, and then extended 2 months to arrive at an 8-month calculation.
In this court plaintiff, in order to avoid the necessity of changing all the calculations made in its audited claim presented to the contracting officer (except the adjustments involved in refining the claim from 8 months to 7 months 19 days) has adopted the same figures based upon the so-called representative January 1-August 31, 1956 period. It contends that, in any event and considering the categories of the overhead indirect labor accounts selected, substantially the same results would be produced if any other 8-month period were selected out of the 22 months involved, since the work in such categories was allegedly performed through the ¿ntire 22 months.
After the 16 categories or departments were selected, as constituting those in which services were allegedly performed on this contract for the full 22 months, plaintiff, in order to obtain a typical total amount of expenditure in each such department for salaries during the representative 8-month period from which, upon analysis of the functions performed by the personnel whose activities fell into the 16 categories, an appropriate allocation to the gun contract would be made, *472 used the salary of one or more of the newest employees hired in such department during such period. Thus, salary rates and payments in the later “representative” period are, in effect, related to expenditures in the actual “delay” period at the beginning of the production period (or to the “extended” period of production at the end of the contract period).
The total of the overhead expenses for the 8-month period of the 16 indirect labor categories or departments for all work performed therein, both Government and commercial, was approximately $320,000. Plaintiff’s claim of $40,906.41 on the 16 categories is approximately 18y2 percent of said total of $320,000. During the same period the direct labor allocated to Government work was 14.1 percent of the total direct labor.
(e) For the following reasons, it must be concluded that plaintiff has failed to carry its burden of showing that its aforesaid method of calculating its “indirect labor” damages is a true measure of the increased costs incurred due to the dimensional defects in all 16 of the categories:
1. Many of the categories of work were obviously closely related to the nature and state of the production work then going on, including the direct labor operations, i.e., they were variable with production. Production in full swing after May 1956, when receivers were finally received in production quantities, would be different from the limited type of production that would be going on during the delay period prior to May 1956. For instance, more work would obviously be required from the “Maintenance-Tools” department when production was in full swing, as would also be true of the “Washing & Tumbling,”[10] and the “Blueing & Parkeriz-ing”[11] departments. The “representative” January 1-August 31, 1956 period selected includes several months of full-scale production after May 1956. The actual delay period herein involved is that from October 1, 1955, when production activities commenced on a limited basis, to May 18, 1956, constituting the 7-month, 18-day period when no *473 receivers were at band. Thus, the so-called “representative” period is not, from a cost standpoint, representative of the delay period herein involved and from which excess costs due to the dimensional defects may be obtained. Plaintiff’s excess costs would be those costs incurred over and above those normally expected. Since, after it commenced full-scale production in May 1956, it completed the contract as planned 14 months thereafter, any excess costs of the indirect or overhead type herein claimed would be those incurred in the period October-May 1956 that were shown to be applicable to the instant contract. For instance, no direct increase in the time spent on the claimed “Maintenance” categories, or the categories of “Set-up,” “Inspection — Tools & Gages” and “Safety & Fire Prevention,” is shown as a result of the delay.
2. Plaintiff utilized many of its indirect labor employees in the various departments on an “as needed” basis. This was accomplished by either transfers between departments or utilizing indirect employees to handle many functions as the need arose from day to day, such as receiving, shipping and material handling. Employees worked on Government and commercial work interchangeably. There is no showing that any employee stood idle as a result of the delay. Nor is it established that such shifting of employees caused any additional expense to plaintiff by reason of the extended production period beyond that originally planned. Further, the shifting of employees or the hiring of new employees during 1956 is not necessarily indicative of excess costs on the instant contract, since, measured by direct labor expenditures, plaintiff doubled its commercial work in 1956 over that of 1955. Plaintiff also had other Government work. It would appear that the same reasons which prevent an increased cost claim on direct labor would be applicable to most of the 16 categories of “indirect labor.” That there was a close relationship between “direct” and “indirect” labor is indicated by the above-mentioned similar percentages of expenditures in the two categories during the “representative” 8-month period.
(f) Of the 16 “indirect labor” categories claimed by plaintiff, only the following may be considered as allowable excess *474 costs in. amounts applicable to the October 1955-May 1956 delay period :
1. “Supervision & Foremen.” (a) The record substantiates that a foreman (Ealph Cole) was hired specifically for this contract and continued in this capacity for the 22-month production period. Thus, salary for 7 months and 18 days was paid to him in excess of the salary that would otherwise have been paid for his services on this contract. (Actually, this is in the nature of a direct and nonallocable cost, rather than an indirect cost.) (b) The record also shows that two supervisor-foremen (Howland and Hope) spent extra time specifically working on the interference problem. The hours they so spent at their hourly rates of pay resulted in excess costs. (Actually, this too is a direct charge similar to item 2 above, headed “Engineering time to work out interference.”) (c) Thus, the total of excess costs on the “Supervision & Foremen” category for 7 months 18 days is $4,374.34.[12]
2. “Engineering^ This item represents the extra time spent by two engineers (Smith and Stevens) specifically on the interference problem. The hours they so spent at their hourly rates of pay resulted in excess costs of $411.53. (Actually, this too is in the nature of a direct charge, similar to item 2 above, “Engineering time to work out interference,” and the Howland-Hope component of the “Supervision & Foremen” item.)
3. “Janitors.” Although the proof is not entirely satisfactory as to the extent of such services in the early months of production as related to the same service during the quantity production period, nevertheless, plaintiff does show with sufficient definiteness that, with respect to the category labeled “Janitors,” janitorial services were required continuously for the plant areas assigned to this contract during the entire production period of approximately 22 months, so that such services during the 7-month, 18-day delay period did constitute excess costs.
The janitor who worked in the contract areas (Smith) was paid $2,115.98 during the 7-month, 18-day delay period.[13]
*475 4. The other 13 categories of “indirect labor” are disallowed for the reasons hereinabove set forth.[14] Plaintiff has failed to prove that it suffered increased expense therefor by reason of the delay. This failure of proof, together with the easy transferability between departments, the substantial increase in plaintiff’s nonmilitary work over the contract period, and the fact that many of the employees specifically singled out were hired or transferred into the affected departments near the time when full-scale production started, indicates that plaintiff’s employees were efficiently utilized and that none of them were permitted to be wholly or partially idled as a result of the delay.
(g) The balance of plaintiff’s claim consists of (1) payments, at appropriate rates, related to payroll taxes and fringe benefits, and (2) “General and Administrative Expenses,” also at an appropriate rate as substantiated by plaintiff’s records (4y2 percent).
No profit is included in plaintiff’s claim.
50. In summary, plaintiff’s proved excess costs due to the delay caused by the dimensional defects, as set forth in findings 47-49, are as follows:
1. Travel expenses to Springfield, Mass_ $215. 47
2. Engineering time to work out interference_ 240.00
3. Indirect Labor:
Supervision and Foremen_$4, 374.34
Engineering - 411.53
Janitor- 2,115. 98
Total Indirect Labor_ 6,901. 85
4. Disability and Group Hospital — 2 employees at $2.38 X 7 months, 18 days_ 36. 08
5. Group Insurance — 2 employees $2,800 at $1.53 X 7 month, 18 days_ 32.48
6. Pension contributions — 2% X $6,901.85_ 138. 04
7. Compensation Insurance — $.824/C X $6,901.85 _ 56. 87
8. F.I.C.A. Taxes — 2% X $6,901.85_ 138. 04
*476 9. Unemployment Taxes — 3% X $6,901.85 - 207. 05
Total Payroll Taxes and Fringe costs- 608.56
Total — Items 1-9- 7, 965. 88
10. General & Administrative Expenses at 4%%- 358.46
Total Excess Costs- 8,324. 34
CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover in the amount of eight thousand three hundred twenty-four dollars and thirty-four cents ($8,324.34), and judgment is entered for plaintiff in this amount.

Tie opinion, findings of fact and recommended conclusion of law are submitted under the order of reference and Rule 57(a).

 Defendant was anxious to obtain the guns as soon as possible. Despite the delay it itself caused, when it did finally issue the change order, it urged plaintiff to do its best to meet the original delivery schedule. Plaintiff promptly pointed out that this would be impossible.

 Plaintiff agrees that this was the delay period (Transcript, p. 126; Plaintiff’s Reply Brief to the commissioner, p. 9).

 Although the contract provided that plaintiff must “provide capacity for a monthly rate of 10,000” submachine guns, it was not actually required to produce 10,000 guns per month.

 Approximately one-third of plaintiff’s total manufacturing area was allocated to the manufacture of the submachine gun.

 Serio’s final delivery of receivers without cover assembly was scheduled for the first week of September 1956. Plaintiff was not obliged to make its final delivery of finished weapons to the Government until the last week of October 1956, approximately 7 weeks later.

 Steel which was harder in Quality was less likely to conform to the contours of the die and would result in an end product with a “plus” tolerance. Conversely, if the steel was soft, there was a tendency for It to overconform, resulting in an end product In the “minus” range of permitted tolerances. The hardness and softness of steel of any type, as well as its thickness, tends to vary from lot to lot and from shipment to shipment.

 For instance, where the distance between the centerline of the rods of the stock at the extreme prong ends would be at its permitted maximum of 1.256 inches (1.196 inches plus a tolerance of .060 inch (finding 19)i), it would not fit into holes with the distance between their centers being at their permitted minimum measurement of 1.188 inches (1.208 inches minus a tolerance of .020 inch (finding 19)).
Further, where such stock rod centerline distance at the extreme prong ends would be at its permitted minimum of 1.171 inches (1.196 inches minus a tolerance of .0250 inch (finding 19)), so that it would, at such end, fit into holes so dimensioned (i.e., 1.188 inches from their centers), if the centerline distance of the stock rod at the handle end would be at its permitted maximum of 1.218 inches (1.208 Inches plus a tolerance of .010 inch (finding 19)), it could not be pushed all the way through such 1.188-inch minimum dimensioned holes, and would “bind” on the way through.
These examples are illustrative and are not set forth as shown by the record as instances that actually happened with such precise measurements. Actually, deviations between the centerline stock rod distances, and the distances between the center of the holes would not be the sole cause of the interference. It would also depend on the size of the holes. This was in fact the way the problem was solved. The design of the receiver was changed so as to enlarge the radii of the holes, with all the above-mentioned centerline distances and tolerances remaining the same.

 This figure was a typographical error. The statement should have read “.026 interference,” .026 being the difference between the 1.226 distance between the holes on the receiver and the 1.200 distance between the center of the rods of the stock.

 This proposed schedule was repeated verbatim on a “Production Forecast” Government form which plaintiff filled out and submitted to defendant on May 4, 1956, which was still prior to the delivery to plaintiff of receivers in production quantities.

 2. CHANGES
The Contracting Officer may at any time, by a written order, and without notice to the sureties, mate changes, within the general scope of this contract, in any one or more of the following: (i) drawings, designs, or specifications, where the supplies to be furnished are to be specially manufactured for the Government in accordance therewith; (ii) method of shipment or packing; and (iii) place of delivery. If any such change causes an increase or decrease in the cost of, or the time required for, performance of this contract, an equitable adjustment shall be made in the contract price or delivery schedule, or both, and the contract shall be modified in writing accordingly. Any claim by the Contractor for adjustment under this clause must be asserted within 30 days from the date of receipt by the Contractor of the notification of change: Provided, however, That the Contracting Officer, if he decides that the facts justify such action, may receive and act upon any such claim asserted at any time prior to final payment under this contract. Eailure to agree to any adjustment shall be a dispute concerning a question of fact within the meaning of the clause of this contract entitled “Disputes.” However, nothing in this clause shall excuse the Contractor from proceeding with the contract as changed.

 12. DISPUTES
Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Contractor. Within 30 days from the date of receipt of such copy, the Contractor may appeal by mailing or otherwise furnishing to the Contracting Officer a written appeal addressed to the Secretary, and the decision of the Secretary or his duly authorized representative for the hearing of such appeals shall unless determined by a court of competent jurisdiction to have been fraudulent or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or not supported by substantial evidence be final and conclusive: Provided, That if no such appeal is taken, the decision of the Contracting Officer shall be final and conclusive. In connection with any appeal proceeding under this clause, the Contractor shall be afforded an opportunity to be heard and to offer evidence in support of its appeal. Pending final decision of a dispute hereunder, the Contractor shall proceed diligently with the performance of the contract and in accordance with the Contracting Officer’s decision.

 A degreasing and polishing operation.

A rust preventive operation.

 Their salary for 8 months was $4,616.32. For 7 months 18 flays, it was $4,374.34 (.94758064 of $4,616.32).

 His salary for 8 months was $2,233.03. Adjusted to 7 months 18 flays, the figure is $2,115.98 ($2,233.03X.94758064).

 The “Factory Office” category is in effect covered by the “General and Administrative Expenses” item, -which is allowed.